ARNOLD and others *vs.* GILBERT and others.

Where a testator, by his will, mentioned several *particular* purposes for which he authorized sales of his real estate to be made, viz: the payment of debts, and certain specified legacies, and then the residue of his estate, real and personal was devised to the executors in trust, and they were expressly directed and required to sell the same for the *general* purpose of dividing it into shares of sevenths, and distributing such shares among the children and grandchildren of the testator; *Held* that although the *particular* purposes of the will might only require a partial conversion of the realty into personalty, yet that the *general object* and scope of the will rendered it evident that sales of the whole real estate were intended, for the general purposes of the will; and that this amounted to a conversion of the same into personalty, to all intents ; and that the beneficiaries took the same as personal property.

*Held also* that the fact that no time was fixed, within which sales were to be made, and that it was left to the discretion of the executors to effect sales from time to time *when,* and in the best *manner* they could, did not alter the case; their duty, in regard to effecting sales, being as imperative as though the testator had specified a time within which sales should be made and the whole estate divided.

Arnold *v.* Gilbert.

Where no time is specified for the performance of such a trust, a *reasonable* time will be allowed; and should it be unreasonably delayed, a court of equity will interfere, and compel a performance.

Where a testator, after directing the sale of all his real estate, by his executors, for the general purposes of his will, gives the executors ample powers to lease lots for terms of years, to insure, rebuild and repair houses, and to sell, purchase and exchange gores, strips, or pieces of land, the granting of such powers to them will not be deemed as interfering with the paramount duty of selling the real estate, according to the ultimate design and object of the will. Until the real estate can all be sold, the power to manage it to the best advantage may be exercised, and is not inconsistent with the obligation to sell.

Persons taking the beneficial ownership of property, under a will, take it in the character which the testator has thought proper to impart to it. If he gives money, to be laid out in land, then it vests as land. If land is devised to be sold, and the proceeds are given over, they become personalty, and vest and pass as such.

The principle on which the doctrine of conversion rests is, that whatever, in a will or other instrument, is directed or agreed to be done is, in equity, considered as already performed.

The general rule is to date the conversion as taking place on the death of the testator; unless there is something special in the power of sale, making its exercise, or performance, depend on the happening of some event or contingency to arise subsequently, or on the discretion of the executor or trustee to sell, or not. But if the direction is imperative, requiring a sale at all events, and leaving it discretionary only as to the time and manner of selling, then the sale, when made, has the same effect, in respect to the rights of the parties in interest, as though made immediately.

A general power in trust, the execution or non-execution of which does not depend on the mere volition of the trustees, is imperative in its nature, and imposes a duty, the performance of which may be compelled in equity.

Where the execution of a general power in trust to sell real estate, unlimited as to time, is not made to depend on the happening of any event which might possibly carry it beyond the duration of two lives in being, the validity of such power cannot be objected to on the ground that it unduly suspends the alienability, or absolute ownership of the property.

The 63d section of the statute of uses and trusts, respecting trusts for the receipt of the rents and profits of lands, ought not to be extended by the courts, because of the *analogy,* to trusts of personal property. *Per* McCoun, J.

A testator, by his will, gave to his wife, for life, in lieu of dower, a third of the net rents of his real estate, so long as it should remain unsold. At her death this third was to be divided into equal sevenths, one-seventh being given to each of the testator's sons, G., D. and C., absolutely, and one-seventh to E. F. for life, or so long as she should remain single, and at her death or marriage, to her children or next of kin absolutely, as in case of intestacy. *Held* that these were all valid gifts; that the bequest to E. F. would vest an absolute ownership in her personal representatives at her death, (if it did not sooner

Arnold *v.* Gilbert.

vest in her children, by her re-marriage ;) and that her death would be but the termination of a second life estate in so much of the fund.

By the same will the interest of one other seventh of the capital set apart for the use of the widow was given to Mrs. H. during life, or while she remained single; and at her death, or re-marriage, the principal of her share was to revert and become a part of the residuary estate of the testator to be divided into six parts between his five sons and E. F, his daughter, she to take her sixth of this seventh in the same manner as she took her original one-seventh; the limitation being the same. And the sons, G., D. and C., each took his sixth of Mrs. H.'s seventh absolutely. By the 19th section of the will the original seventh of the capital, and one-sixth of Mrs. H.'s seventh, given to two other sons, George and W., were placed in trust for investment, and the interest only was to be paid to them respectively, during their lives, and the remainder to their children ; but in the event of either, or both, dying without children then living, their shares were to fall back into the estate, to be again divided equally between the sons G., D. and C., and whichever of George and W. should survive the other. And to the survivor the interest was limited for life, and the principal was to be divided after his death, in the manner directed in respect to his original seventh part. *Held* that the effect of the 19th section of the will, so far as George and W.'s shares of the estate generally were concerned, was to give to them, by way of cross-remainders, a contingent interest for life in each other's shares; a contingency depending on the event of either dying without children living at the time of his death, and therefore operating in law to prevent the vesting of an absolute ownership in their respective shares, at their deaths, both as to their original sevenths and as to their sixths of the seventh given in the first instance to Mrs. H.

*Held also,* that the vesting of an absolute ownership in their original sevenths was not thereby postponed beyond two lives, nor was it so postponed in their sixths of Mrs. H.'s seventh, except in her seventh of the one-third set apart in the first instance to the widow's use. That in that one-third there was first a life estate in her, then a remainder for life in one-seventh of the third to Mrs. Hunt, and then a remainder over of a sixth of that one-seventh to each of the sons, George and W., but not so limited as to vest in either of them an absolute ownership, on the death of Mrs. H. And that the limitations in favor of their children as purchasers, or takers in their own right, or to the children of the survivor, and in case none were living at their decease, then to others, were too remote, and of no effect in law.

In EQUITY. This was an appeal, by the defendants, from a decree of the late vice chancellor of the first circuit, declaring the invalidity of the last will and testament of the late William W. Gilbert deceased. The case before the vice chancellor, with his decision thereon, is reported in 3 Sandford's Chancery Reports, 531 ; where the facts are fully stated.

Arnold *v.* Gilbert.

*E. H. Owen, C. O'Conor & Geo. Wood*, for the appellants.

*Edward Sandford*, for the respondents.

*By the Court*, McCoun, J. The first question which we are to consider in this case is, whether by the will of the late William W. Gilbert his real estate as devised, is equitably converted into personalty to all intents ; or in other words, whether the beneficiaries under it take the estate as real or as personal property ?

The testator gave to his wife (among other things) one-third of the rents, issues and profits of his real estate for life, to be paid to her so long as his real estate should remain unsold, (and when sold her thirds to be paid according to directions subsequently given concerning it,) and the use of his mansion house for a year—all of which are in lieu of dower. He then gave to five of his sons, each a legacy of $5000, payable out of his real and personal estate as thereinafter directed ; and to another son (Ephraim) the interest of $3000 for life, that sum to be raised from his personal and real estate. And to a deceased son's widow he gave the interest of $10,000 so long as she should remain a widow, to be raised from the sales of his real estate, the principal afterwards to be equally divided between her three daughters, (grandchildren of the testator ;) and to two of such grandchildren he gave each a legacy of $1000 in addition. The testator then, by the 10th section of the will, devised all the residue of his estate both real and personal to the five persons named as executors of the will, as joint tenants, *in trust :* 1st. To take, have, hold, use and possess all the real estate, from and immediately after his death, excepting the mansion house, and that also, after his wife's occupancy of it for a year, and to receive the rents and profits thereof ; 2d. From and immediately after his death to sell any part of the real estate which might be necessary to pay debts ; 3d. After his wife's third of the net amount of all the rents is taken out, then to pay out of the residue, the interest on the legacies to the respective legatees—the interest to commence six

months after his death, and if not sufficient to pay the interest in full to all, then the same to be paid ratably ; 4th. From time to time *to proceed and sell any part, or all,* of his real estate, either at private sale or at auction, and to convey the same in fee simple to purchasers ; 5th. Upon every sale, at least one-third of the purchase money to be left on bond and mortgage, if it can be done ; that being his wife's right in lieu of dower, so that if she should live until his real estate should all be sold, her interest might be safely placed and made secure. This is by way of recommendation. 6th. He directs that the sales of the real estate shall be made with a view to *invest* the sums required and to *pay* the legacies with as little delay as possible, always having a regard for the *interest* of the *whole* estate, as well as of the *particular* legatees ; it being his will that the pecuniary or other devises shall be carried into effect and consummated from the *funds resulting from or arising out of the real estate.* Then by the 15th section of the will, is this further trust declared ; " that upon a sale and final distribution of the estate, there ' shall be an estimate—an account taken of the whole remaining—and the surplus, including the sum placed at interest for the son Ephraim for his support during life, as well as the funds for the use of his wife during her life, be divided and distributed in the following manner, *whenever, as soon, and as often,* as can be done to the *close* and *settlement* of the whole estate and its concerns ;" that is to say, one-seventh part to each of his sons, Garret, David, Clinton, George and Warren, and the interest of one-seventh to each of his daughters, Mrs. Hunt and Mrs. Fish. The trusts and limitations over of the shares of Mrs. Hunt and Mrs. Fish, and of the two sons George and Warren will be afterwards noticed.

Now here are several *particular* purposes for which sales of the real estate are authorized and directed by this will ; first, the payment of debts if necessary ; next the payment of the legacies to the five sons, and the $3000 to be set apart for the use of Ephraim, and the $10,000 to be raised and set apart for the use of the deceased son's widow and her children, and the additional $2000 to two of such children ; and then there is

Arnold *v.* Gilbert.

the *general purpose,* for which all the residue of the estate, both real and personal, is devised to the executors in trust, and which they are expressly directed and required to sell, viz. the final division of it into shares of sevenths, and the distribution of such shares among the children and grandchildren of the testator. The *particular* purposes of the will above mentioned might only require a partial conversion of the realty into personalty, but when the *general object* and scope of the will is looked at, it is very clearly to be seen that sales of the whole real estate are intended for the *general* purposes of the will; and that this amounts to a conversion " out and out," or to all intents, would seem not to admit of a doubt. (*Kane* v. *Gott,* 24 *Wend.* 641.)

That no time is fixed within which sales are to be made, and that it is left to the discretion of the executors to effect sales from time to time, *when,* and in the *best manner* they can, does not alter the case. Their duty in regard to effecting sales is as imperative, upon a fair construction of this will, as though it had *specified a time* within which sales should be made and the whole estate divided. Where no time is specified in such cases, for the performance of the trust, a *reasonable* time will be allowed; and should it be unreasonably delayed, a court of equity will interpose and compel performance. (1 *Hov. Supp.* 105.)

It is said, however, that one-third of the real estate might remain unsold during the life of the widow, because the will would be complied with, in respect to her and her rights under it, by the executors continuing to pay her one-third of the net rents as long as she lived. This is true. Still their power to sell the whole at any time, (including the one-third,) remains unimpaired, and the necessity of doing so for the ultimate purpose of the will, is not thereby lessened. The probability of the whole being sold in her lifetime, appears to have been in the contemplation of the testator; since he directs the interest of one-third of the purchase money to be paid to her, instead of one-third of the rents. Nor does the fact that very ample powers are given to the executors, by the will, to lease out lots

(parts of the estate,) for terms of years to insure houses and rebuild and repair, in case of loss by fire, and to look after corporation assessments, and to sell, purchase, and exchange gores, strips, or pieces of land with other owners, interfere in the least with the paramount duty imposed upon them of sooner or later effecting sales of the whole property according to the ultimate design and object of the will. Until the property can all be sold, the power to manage it to the best advantage for the interest of those concerned, may be exercised, and they are not inconsistent.

No principle is better established than this, that those who take the beneficial ownership of property under a will, take it in the character which the testator has thought proper to impart to it. If he gives money to be laid out in land, then it vests as land. If land is devised to be sold and the proceeds are given over, it becomes personalty and vests and passes as such. That the will in question, in all its gifts, is governed by this principle, seems to me very clear. *Money* to be produced by the sale of land, and not *land* itself, is directed to be divided from time to time; and at the close and final settlement and distribution into shares of sevenths, it is *money only* which the beneficiaries are to take. All the directions of the will in relation to the trust shares of the two daughters and two of the sons, refer to their shares as funds or money to be loaned out at interest or invested in stocks. This is likewise a case in which the conversion is to be considered as having taken place at the death of the testator, when the will went into effect. The principle on which the doctrine of conversion rests is, that whatever in a will or other instrument, is directed or agreed to be done, is in equity considered as actually performed. (*Craig v. Leslie*, 3 *Wheat.* 563. *Kane* v. *Gott*, 24 *Wend.* 660.) The general rule is to date the conversion as taking place on the death of the testator, unless there is something special in the power of sale, making its exercise or performance depend on the happening of some event or contingency to arise subsequently, or on the discretion of the executor or trustee to sell or not. But if the direction is imperative, requiring a sale at

all events, and leaving it discretionary only as to the time and manner of selling, then the sale when made, has the same effect, in respect to the rights of parties in interest, as though made immediately. (*Leigh & Dalzell*, 48. *Casamajor* v. *Strode*, cited in note, 19 *Ves.* 390.) In *Hutchin* v. *Mannington*, (1 *Ves. jr.* 366,) Lord Thurlow expressed himself very strongly on the point, that if real estate was devised upon trust to sell in a *reasonable* time, or with all possible diligence, it would not depend upon the caprice of the trustee to sell, nor upon his dilatoriness. In some way it could be sold immediately, and therefore should be considered as sold from the testator's death. Lord Eldon admitted the soundness of that general proposition in *Sitwell* v. *Bernard*, (6 *Ves.* 536,) and in *Gaskell* v. *Harman*, (11 *Id.* 489, see pp. 497, 507.) And in *Walker* v. *Shore*, (19 *Id.* 386,) where the devise of copyhold estate was to executors in trust "to sell in such manner and at such time as they should think proper," it was held by Sir W. Grant, M. R. that these words, though of large discretion, did not make the right of the person who was to have the benefit of the proceeds for life, dependent on the *time* at which the sale should actually take place. The trustees could not arbitrarily postpone the sale to an indefinite period. Some fixed rule was necessary, by which to determime the rights of parties, and by which to hold the conversion to have been made at some given period, just as much as if the trustees had been directed to sell "with all convenient speed."

In *Fitzgerald* v. *Jervoise*, (5 *Mad. Rep.* 25,) it was held that a devise to a trustee to sell the real estate with "all convenient speed," after the death of a tenant for life, was *prima facie* a direction for an *immediate* sale after such death, and entitled the beneficiary of the fund to the rents which had accrued intermediate the death of the tenant for life and the time of the actual sale, which had been somewhat delayed by the trustee. See also *Ashby* v. *Palmer*, (1 *Mer.* 296,) to the same effect, and *Leigh & Dalzell*, 57, for the rules deducible from the adjudged cases.

This question as to the *time* when the conversion is effected,

is perhaps not very important to the case in hand. Such questions generally arise between an heir and the personal representatives of legatees or devisees dying before actual conversion; but such is not the controversy at present.

With regard to the power in this will by which the conversion is produced, it may be observed that it is a "general power in trust," and its execution or non-execution not depending on the mere volition of the trustees, is imperative in its nature, and imposes a duty, the performance of which may be compelled in equity. (1 *R. S.* 734, § 94, 96.) And further, the execution of the power not being made to depend on the happening of *any event* which might possibly carry it beyond the duration of two lives in being, no objection arises that it unduly suspends the alienability or absolute ownership of the property. Neither is there any valid objection to it as *a trust* on account of the *purposes* for which it is granted; the statute allowing of trusts to sell for the benefit of creditors and legatees.

This estate, then, in the hands of the trustees, being treated *as money*, we are next to inquire whether any thing in the *trusts* or *limitations* over of any of the shares or portions into which it is divided, are contrary to law?

In considering this branch of the case it is only necessary to apply to it the rule of law as prescribed by the statute in relation to expectant estates in personal property. Trusts may be created of such property; future and contingent interests in it may be given; and all that the policy of the law requires is, that the absolute ownership shall not be suspended by any limitation or condition annexed to the gift, for a longer period than during two lives in being at the death of the testator, if the gift is by will; and in all other respects, that the limitations of future or contingent interests in this species of property shall be subject to, and not transcend the rules also prescribed by statute, in relation to *future estates* in *lands.* (1 *R. S.* 773, §§ 1, 2.)

A strong argument has been presented on the hearing against the late chancellor's doctrine in a number of cases decided by him, that the 63d section of the statute of *uses and trusts* is to

be applied by *analogy* to *trusts* of *personal* property.   We are inclined to think with Cowen, J., (*see* 24 *Wend.* 666, 667,) that a statutory provision which has reference only to trusts for the *receipt of the rents and profits of lands*, ought not to be extended by the courts, because of the analogy, to trusts of personal property.   And if necessary to this case we are prepared to say that the 63d section has no application.

There are only two portions of the estate in regard to which the limitations over present any serious question of being too remote.   The first is the one-third of the capital set apart for the widow's use during her life.   At her death this third is to be divided, as forming part of the residuary estate, into equal sevenths.   One seventh goes to Garret, absolutely.   One seventh to David, in like manner.   One seventh to Clinton, in like manner.   One seventh to Elsey Fish for life, or so long as she remains single, and at her death or re-marriage, to her children or next of kin, absolutely, as in case of intestacy.   All these are clearly valid gifts.   That to Mrs. Fish will vest an absolute ownership in her personal representatives, at her death, (if it does not sooner vest in her children by her re-marriage.) And her death is but the termination of a second life estate, in so much of the fund.

The interest of one other seventh is given to Catharine Hunt during life, or while she remains single.   At her death or re-marriage the principal of her share, less $5000 taken out and invested for her daughter Matilda Vail during life, with remainder to the daughter's heirs, (next of kin,) reverts and becomes a part of the residuary estate, to be divided into *six* parts between the five sons and the daughter Elsey Fish, she to take her sixth of this seventh in the same manner as she takes her original one-seventh, the limitation being the same.

The sons, Garret, David and Clinton, each take their sixth of Mrs. Hunt's seventh in the same manner as they take their original sevenths—that is, absolutely.   By the 19th section of the will, however, George and Warren's original sevenths and their sixths of Mrs. Hunt's seventh, are placed in trust for investment, and the interest only is to be paid to them respec-

tively during their lives, and the remainder to their children; " but in the event of either or both dying without children then living," their shares fall back into the estate, to be again divided equally between the sons, Garret, David and Clinton, and whichever of the two, viz : George and Warren, happens to survive the other. And to the survivor the *interest* is still limited for life, and the principal is to be divided after his death, in the manner directed with respect to his original seventh part. The effect of the 19th section of the will, so far as George and Warren's shares of the estate generally are concerned, is to give by way of cross-remainders a contingent interest for life in each other's shares—a contingency depending on the event of either dying without children living at the time of his death, (a possible if not a probable event,) and therefore operating in law to prevent the vesting of an absolute ownership in their respective shares, at their death. This is so both as to their original sevenths and as to their sixths of the seventh given in the first instance to Mrs. Hunt. The vesting of an absolute ownership in the former, however, is not thereby postponed beyond two lives; nor is it so postponed in their sixths of Mrs. Hunt's seventh, *except* in her seventh of the *one-third* set apart in the first instance for the widow's use. In that one-third there was first a life estate in her, then a remainder for life in one-seventh of the third to Mrs. Hunt; and then a remainder over of a sixth of that one-seventh to each of the sons, George and Warren ; but not so limited as to vest in either of them an absolute ownership on the death of Mrs. Hunt. The limitations in favor of their children as purchasers or takers in their own right, or to the children of the survivor, and in case none are living at their decease, then to others, are too remote and of no effect in law ; and hence it is that there is here an intestacy as to two-sixths of one-seventh of a third, which is equal to a sixty-third part of the whole estate.

The other portion of the estate about which a similar question is made, is the $3000 set apart for the benefit of Ephraim during life.

By the 7th section of the will this sum, after the death of

Arnold *v.* Gilbert.

Ephraim, is expressly given "to be equally divided between the five sons, including Warren and George, their executors, administrators and assigns, share and share alike"—words importing absolute vested gifts. But by the 15th section, it would seem as if this $3000 was to be included in the final distribution, and to be divided into seven parts, George and Warren each taking a seventh of it under the trust and subject to the limitations declared in the subsequent 19th section. It is the duty of the court to reconcile this seeming incongruity and repugnancy, if it can be done without doing violence to any of the expressions of the will. In the first place it may be observed ·that the language of the 7th section is clear and explicit, in dividing the $3000 into five parts and giving to each son an absolute ownership. There is no ambiguity in that part of the will; while the 15th section is so framed as to admit of some latitude of construction and meaning. It speaks of what shall be done "upon a sale and final distribution of the estate," and it authorizes distribution to be made "*whenever*, as *soon*, and *as often* as can be done to the close and settlement of the whole estate and its concerns." These words show that the testator expected dividends to be made from time to time, and in making the estimate or account for the final settlement and distribution, the Ephraim fund and the widow's third are to be included. But suppose those funds have been divided and paid over previous to the final distribution, as they might be on the dropping of the lives, then of course the parties would be charged with the amounts paid to them as so much on account of their sevenths of the estate. The will very clearly allows this to be done. And so, if at the time of making the final settlement and distribution, the fund of $3000 is not ready to be divided, (Ephraim being still alive,) yet as the other five sons are to receive it at his death, each of them may be charged with a fifth of the amount, as so much towards his general residuary share in like manner.

In this way the will is complied with, and the 7th and 15th sections are made to harmonize. As George and Warren take their shares of the $3000 absolutely, according to the 7th sec-

Arnold v. Gilbert.

tion, the same are not necessarily brought under the trust declared in and by the 19th section. The " part or portion" there spoken of as given to George and Warren, must be understood as the part or portion given to them by the 15th and 17th sections of the will. It is not to be supposed that those words were intended to embrace the legacy of $5000 previously given to each of them by the 6th item of the will, because the trust of those legacies had already been fully declared ; and there is less reason to believe that the testator intended the trust should embrace their portions of the $3000, after using words so strongly expressive of absolute gifts as he had just used in relation to the shares of that money.

After a careful examination of all the other trusts and limitations contained in this somewhat complex will, we find nothing more to condemn, than the limitations over, of the two-sixths of Mrs. Hunt's seventh of one-third of the estate ; as to which there is virtually an intestacy. But this has not the effect of disturbing the whole will. All the other provisions, trusts, powers and limitations remain in full force. The decree appealed from, made by the late vice chancellor, invalidating the whole will, must therefore be reversed, except so far as it sets aside the trust of one sixty-third part of the whole estate, which portion remains undisposed of by the will and is to be distributed as in case of intestacy, among the next of kin of the testator. The decree now to be entered may provide for the taking of an account of that part of the proceeds of the estate and for the distribution of it according to law ; first, however, taking out of it the costs of this suit to all the parties who have appeared and litigated it ; which costs we think should be borne by this fund and not by the defendants personally, nor by any other portion of the estate.